UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DEBORAH W. CASKEY,

                                    Plaintiff,        DECISION & ORDER

-vs-                                    13-CV-6093-CJS

COUNTY OF ONTARIO,

                                    Defendant.

**APPEARANCES**

For Plaintiff:
          Ryan C. Woodworth, Esq.
          Christina A. Agola, PLLC
          1415 Monroe Avenue
          Brighton, NY 14618
          (585) 262-3320

For Defendant:
          Kristen J. Thorsness, Esq.
          Ontario County Attorney
          27 North Main Street 4th Floor
          Canandaigua, NY 14424
          (585) 396-4166

**INTRODUCTION**

**Siragusa, J.** This employment discrimination case is before the Court on Defendant's motion to dismiss. Defendant argues that many of the allegations are precluded on *res judicata* grounds or statute of limitations grounds, and that the remaining allegations are insufficient to state a claim and that they should be dismissed under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, Defendant's motion to dismiss is granted regarding all claims.

# BACKGROUND

For the purposes of adjudicating the pending motion, the Court will assume that the allegations in the complaint are true and that the complaint also encompasses the matters described in Plaintiff's filing with the Equal Employment Opportunity Commission ("EEOC"). *See Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir. 2000) (complaint includes any statements or documents incorporated by reference and documents plaintiff either possessed or knew about and upon which she relied in bringing suit). In that regard, the following paragraphs from the complaint constitute the factual allegations:

15. Plaintiff is a Caucasian female over the age of 40; Plaintiff's date of birth is June 13, 1947.
16. Plaintiff is a long term employee of the defendant, having been first hired by the defendant in July 9, 1984 as a "Data Entry Operator."
17. Thereafter, Plaintiff tested for and became "Finance Clerk I Grade 6."
18. Plaintiff performed her job in an exemplary fashion throughout her entire tenure.
19. Commencing in the year 2005, Plaintiff had a good faith basis to believe she was being subject to age discrimination, and discrimination on the basis of her disability.
20. Plaintiff suffers from a chronic knee problems [sic], which have resulted in several knee replacements and which significantly impairs one or more "major life activities."
21. The "major life activities" as defined by the ADA which affected Plaintiff included "...walking, and working." 42 U.S.C. § 12102(A).
22. The Defendant had actual notice of Plaintiff's medical conditions for three (3) years.
23. Further, for all relevant times herein, Defendant *regarded* Plaintiff as having such an impairment under 42 U.S.C. § 12102(1).
24. Defendant *regarded* Plaintiff as substantially limited in the major life activities enumerated above, and subjected her to a hostile environment because of that perception, and because of her age, as detailed below.

## *Background of Plaintiff's Claims*

25. By way of background, in or about April of 2005, the County was offering an incentive of $25,000 to the older employees to retire.

26. Department Head Cooley asked Plaintiff did "*[she] plan on retiring early?*"

27. Plaintiff was 58 years old at that time.

28. On June 29, 2006, Plaintiff received a memo from Department head Cooley asking again if she was "*going to retire;*" Plaintiff replied "no."

29. Plaintiff was 59 years old at that time.

30. On July 7, 2006, Department Head Cooley constructed a chart which gratuitously included Plaintiff as "*retiring as of June 13, 2009,*" when in fact Caskey had no intention of retiring whatsoever.

31. On July 15, 2008, Department head Cooley asked Caskey yet again if she was "*going to retire*," and yet again, Plaintiff told Cooley that she had no intention of retiring in 2009.

32. In or about August of 2008, Plaintiff called Human Resources ("HR") and reported what she perceived to be in good faith discrimination based on age due to Department Head Cooley's gratuitous, excessive questioning as to her intention of retiring, when in fact, Plaintiff had no intention of retiring.

33. HR's response was "*the County likes to project and plan ahead,*" but ignored Plaintiff's good faith complaint, and took no further remedial action with regard to the same.

34. Thereafter, Plaintiff was severely scrutinized by Department Head Cooley, who nitpicked and tried to find fault in Plaintiff's every move, no matter how minor.

35. On or about July 1, 2008, Plaintiff met with Department Head Cooley and told him she was going out on disability for knee surgery.

36. Department Head Cooley then questioned Plaintiff if she was going to retire in the next year.

37. On or about February 20, 2009, Plaintiff asked Department Head Cooley for "flex time" for a doctor's appointment.

38. Plaintiff was denied this request, while other substantially younger and similarly situated workers were allowed to take time off for non-medical reasons.

39. Plaintiff complained to HR regarding Department Head Cooley's denial of flex time.

40. Shortly thereafter on March 3, 2009, Department Head Cooley approached Plaintiff in the middle of her work day, in front of co-workers and customers, and screamed loudly at Plaintiff that she did not "balance an account," greatly embarrassing the Plaintiff.

41. Department Head Cooley demanded that Plaintiff prepare a training manual; Plaintiff replied by asking Cooley if he wanted her assume more job responsibilities and training and Cooley said "yes."

42. Two days later, Department Head Cooley informed Plaintiff that she "misunderstood" his intention, and denied her any further training for the purpose of assuming greater job responsibilities.

43. On April 16, 2009, Department Head Cooley presented Plaintiff with formal notice that her position Finance Clerk I, a Grade 6 was being abolished, even though there was no board resolution with regard to the same at that time.

44. Plaintiff was told by Department Head Cooley for the first time ever that she was not "*mechanically inclined*," and that she "*didn't even know how to change [copier] toner*."

45. A week later on April 24, 2009, the Ontario County Board of Supervisors passed Resolution 247-2009 abolishing Plaintiff's position after she had been informed of the same, and creating the position of "Microfilm Machine Operator (Grade 2)."

46. However, that position was not offered to Plaintiff who was qualified for that position (which was essentially her former position with a new name).

47. Thereafter, Plaintiff was told that she would be training several people regarding her job duties and continued to do so until the date she was laid off on June 29, 2009.

48. Plaintiff was told that she was training others so that she would have "back-up" for her vacation, when, in reality, Plaintiff was training other employees to assume her job responsibilities.

49. Plaintiff was laid off 10 days short of 25 years employment with the County, and replaced with a significantly younger female.

50. When Plaintiff inquired with HR *why* her job was shifted around and given to a younger female, Plaintiff was told that "*the County and Cooley could fill positions any way they see fit because [Cooley] is an elected official.*"

### Plaintiff's First EEOC Charge

51. Plaintiff, having a good faith basis to believe that she had been subject to discrimination on the basis of her age and actual/perceived disability, filed a charge of discrimination with the EEOC on or about

September 19, 2009.

52. However, from there, things only got worse for Plaintiff, a dedicated long term employee of the Defendant.

### *Current Claims Set forth in Plaintiff September 2011 Charge of Discrimination*

53. Shortly after filing her charge with the EEOC, Plaintiff began to be subject to verbal assaults and an increase in workload from her supervisors in retaliation from the charges she filed based with the EEOC in September of 2009.

54. On or about July 7, 2010, Plaintiff was asked to meet with her supervisor to review her "Performance Appraisal," however the meeting never took place and to this date, Plaintiff has never seen the Performance Appraisal.

55. Thereafter, on December 10, 2011, Plaintiff had severe pain in her shin, and visited the Public Health Department.

56. On or about December 30, 2010, Plaintiff saw several doctors who advised that she take time off of work and go on disability leave.

57. However, Plaintiff was worried that the department would suffer in her absence, so Plaintiff decided to return to work against the doctors [sic] advice.

58. Subsequently, on January 4, 2011, Plaintiff received a negative employment review from her supervisors which stated that Plaintiff had to be "*monitored*."

59. Plaintiff was extremely worried that her supervisor would retaliate against her by terminating her employment.

60. On or about January 12, 2011, Plaintiff continued having severe leg and knee pain.

61. Plaintiff again saw several doctors, but this time was informed that she required surgery.

62. Thereafter, Plaintiff was out on disability leave for the full six (6) months.

63. On July 14, 2011, at the advice of her doctors, Plaintiff requested an additional thirty (30) day leave of absence after having complications from the surgery, but was denied.

64. However, Human Resources notified Plaintiff that she was approved for the thirty (30) days, but still needed approval from her supervisor, which she never received.

65. On July 28, 2011, Plaintiff sent a second request for a thirty (30) day leave of absence, but never received an answer.

66. On August 22, 2011, Plaintiff was required to return to work because again, she was scared that she would [sic] either going to be terminated or lose her health insurance.

67. When Plaintiff arrived, her supervisor met with her and told her that there were several changes to her job duties, and informed her yet again that she would be closely "monitored."

68. Plaintiff was shocked and, and told her supervisor that she may have no choice but to retire if they could not find additional support for the department.

69. Plaintiff was then admonished that she needed to "***promptly sign her retirement letter***" so they could "***find her replacement***."

70. However, Plaintiff wanted to wait and speak with the Human Resource department before she made her final decision.

71. Plaintiff's supervisors gave Plaintiff no choice but to sign the retirement letter "immediately," compelling Plaintiff to retire from her long term job with the County.

72. Defendant had no legitimate reasons for its actions to treat Plaintiff, a long term employee over the age of 40 in such a discriminatory fashion.

73. Any reason proffered by the Defendant is merely a pretext for unlawful discrimination.

Compl. ¶¶ 15–73. Plaintiff pleads three causes of action: (1) violation of the Americans with Disabilities Act ("ADA"); (2) retaliatory treatment under the ADA; and (3) violation of the Age Discrimination in Employment Act ("ADEA").

## STANDARDS OF LAW

***Rule 12(b)(6) Standard***

In *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (May 21, 2007), the Supreme Court clarified the standard to be applied to a Rule 12(b)(6) motion to dismiss:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a Plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels

and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id.* at 1964-65 (citations and internal quotations omitted). *See also, A TSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'") (quoting *Bell Atl. Corp. v. Twombly*) (footnote omitted); *Iqbal v. Hasty,* 490 F.3d 143, 2007 WL 1717803 (2d Cir. 2007) (Indicating that *Bell Atl. Corp. v. Twombly* adopted "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible[,]" as opposed to merely conceivable.) When applying this standard, a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers,* 192 F.3d 52, 56 (1999), *cert. denied,* 531 U.S. 1052, 121 S. Ct. 657, 148 L. Ed. 2d 56 (2000). On the other hand, "[c]onclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss." *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir. 1995) (*citing In re American Express Co. Shareholder Litig.,* 39 F.3d 395, 400-01 n. 3 (2d Cir.1994)).

***ADEA***

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In order to state a claim of age discrimination

under the ADEA, a plaintiff must allege (1) she is a member of the protected age group, (2) she was qualified for the position, (3) an adverse employment action, and (4) circumstances that give rise to an inference of discrimination. *Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002).

*ADA*

The ADA provides in pertinent part that, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.S. § 12112(a). To allege a plausible case of discrimination under the ADA, a plaintiff must show that: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of [her] disability or perceived disability." *Capobianco v. City of New York*, 422 F.3d 47, 356 (2d Cir. 2005). The ADA definition of disabled is an impairment which "substantially limits one or more of a plaintiff's major life activities." *Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 383 (2d Cir. 1996).

*Retaliation*

In order to state a claim for retaliation, a plaintiff must plausibly allege that "(1) [Plaintiff] engaged in a protected activity; (2) the employer was aware of the protected activity; (3) the employer took adverse action; and (4) a causal connection exists between the protected activity and the adverse action." *Shah v. N.Y. State Dept.*

*of Civil Services*, 341 Fed. Appx. 670, 673 (2d Cir. 2009).

## ANALYSIS

As stated above, both the ADA and the ADEA standards require that a plaintiff plausibly allege an adverse employment action. An adverse employment action may be either "actual," where an employer took action against an employee directly, or the result of "constructive discharge," where an employer pressures an employee into leaving his or her position through repetitive or coercive actions over a period of time. Retaliation broadens this requirement to encompass any negative action taken by the employer in retaliation to an employee's participation in an activity protected by the ADA or ADEA. However, the Court must first determine the extent of Plaintiff's history of employment legally open to evaluation before it can properly investigate Plaintiff's claims potentially involving constructive discharge. Therefore, this analysis turns first to the "background information" Plaintiff provided in her complaint that Defendant alleges is barred or improperly included.

### *Paragraphs 17-54 may be considered background information and are not barred by res judicata or considered untimely*

Defendant argues that the allegations in paragraphs 17–54 of the complaint are time-barred, are barred by *res judicata*, exceed the scope of Plaintiff's EEOC filing, and subsequently are not properly background information. Plaintiff responds by arguing that the allegations in paragraphs 17–54 are relevant background evidence in support of her timely claim, citing to *Jute v. Hamilton*, 420 F.3d 166 (2d Cir. 2005). As the Supreme Court explained in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 2072 (2002):

> First, discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180– or 300–day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

Indeed, in *Pawlowski v. N.Y. State Unified Court System*, 2012 U.S. Dist. LEXIS 85087, *8, 2012 WL 2339263, *3 (W.D.N.Y. June 15, 2012), Chief Judge Skretny stated: "This Court expresses no view on the extent to which acts outside the EEOC filing deadline may be used as background evidence for Plaintiff's surviving claim." Therefore, as far as any of the allegations in paragraphs 17-54 may be time-barred, it is not inappropriate for them to be included in the complaint as background information. Here, the adverse employment actions that form the basis of the Plaintiff's claims occurred within the 300-day period (Compl. ¶¶ 63-72), and any "background facts" outside of that period may be included in the complaint as long as they are not discrete, discriminatory actions upon which the Plaintiff bases any current causes of action.

To the extent that Defendant claims that these paragraphs state facts outside the scope of the EEOC complaint, an examination of Defendant's reasoning on this point in its motion to dismiss reveals that this argument is an extension of the time-bar argument. "Given the 300 day limitations for charges to the EEOC, none of those pre-September 24, 2010 matters could reasonably be expected to have fallen within the scope of the EEOC investigation of Plaintiff's Charge." Def.'s Mot. Dismiss at 5, ECF No. 5. This Court is not bound to recreate the investigation performed by the EEOC. *See generally Butts v. N.Y. Dep't of Hous. Preservation & Dev.*, 990 F.2d 1397, 1402-03

(2d Cir. 1993) (laying out situations where claims not alleged in an EEOC charge are sufficiently related to the allegations in the charge that it would be unfair to bar such claims in a civil action because they are reasonably related). As such, the Court accepts paragraphs 17-54 as neither time barred nor outside the scope of the EEOC complaint.

Next, Defendant argues that paragraphs 17-54 should be stricken because they were the subject of previous litigation and should be considered barred by *res judicata*. Def.'s Mot. Dismiss at 5-6, ECF No. 5. On April 15, 2011, Plaintiff filed a complaint in this Court raising claims for discrimination and retaliation under the ADEA and the New York State Human Rights Law. ECF No. 1, *Caskey v. County of Ontario*, No. 11-CV-6194-DGL (W.D.N.Y. Apr. 15, 2011). The Honorable David G. Larimer issued a decision and order dismissing Plaintiff's retaliation claims, and finding that her ADEA claim, "albeit narrowly, manages to state a claim for age-based discrimination." Decision and Order at 5, Aug. 2, 2011, ECF No. 11. Paragraphs 13–39 of the complaint in Plaintiff's 2011 lawsuit are repeated mostly verbatim in paragraphs 19–50 of the current complaint:

13. Commencing in the year 2005, Plaintiff had a good faith basis to believe she was being subject to age discrimination.
14. In or about April of 2005, the County was offering an incentive of $25,000 to the older employees to retire.
15. Department Head Cooley asked Plaintiff is *"[she] planned on retiring early."*
16. Plaintiff was 58 years old at that time.
17. On June 29, 2006, Plaintiff received a memo from Department head Cooley asking again if she was *"going to retire;"* Plaintiff said "no."
18. Plaintiff was 59 years old at that time.
19. On July 7, 2006, Department Head Cooley constructed a chart which gratuitously included Plaintiff as "retiring as of June 13, 2009," when in fact Caskey had no intention of retiring whatsoever.

20. On July 15, 2008, Department head Cooley asked Caskey yet again if she was *"going to retire,"* and yet again, Plaintiff told Cooley that she had no intention of retiring in 2009.

21. In or about August of 2008, Plaintiff called Human Resources ("HR") and reported what she perceived to be in good faith discrimination based on age due to Department Head Cooley's gratuitous, excessive questioning as to her intention of retiring, when in fact, Plaintiff had no intention of retiring.

22. HR's response was *"the County likes to project and plan ahead,"* but ignored Plaintiff's good faith complaint, and took no further remedial action with regard to the same.

23. Thereafter, Plaintiff was severely scrutinized by Department Head Cooley, who nitpicked and tried to find fault in Plaintiffs every move, no matter how minor.

24. On or about July 1, 2008, Plaintiff met with Department Head Cooley and told him she was going out on disability for knee surgery.

25. Department Head Cooley then questioned Plaintiff if she was going to retire in the next year.

26. On or about February 20, 2009, Plaintiff asked Department Head Cooley for "flex time" for a doctor's appointment.

27. Plaintiff was denied this request, while other substantially younger and similarly situated workers were allowed to take time off for non-medical reasons.

28. Plaintiff complained to HR regarding Department Head Cooley's denial of flex time.

29. Shortly thereafter on March 3, 2009, Department Head Cooley approached Plaintiff in the middle of her work day, in front of co-workers and customers, and screamed loudly at Plaintiff that she did not "balance an account," greatly embarrassing the Plaintiff.

30. Department Head Cooley demanded that Plaintiff prepare a training manual; Plaintiff replied by asking Cooley if he wanted her assume more job responsibilities and training and Cooley said "yes."

31. Two days later, Department Head Cooley informed Plaintiff that she "misunderstood" his intention, and denied her any further training for the purpose of assuming greater job responsibilities.

32. On April 16, 2009, Department Head Cooley presented Plaintiff with formal notice that her position Finance Clerk I, a Grade 6 was being abolished, even though there was no board resolution with regard to the same at that time.

33. Plaintiff was told by Department Head Cooley for the first time ever that she was not "*mechanically inclined*," and that she "*didn't even know how to change [copier] toner.*"

34. A week later on April 24, 2009, the Ontario County Board of Supervisors passed Resolution 247-2009 abolishing Plaintiff's position after she had been informed of the same, and creating the position of "Microfilm Machine Operator (Grade 2)."

35. However, that position was not offered to Plaintiff who was qualified for that position (which was essentially her former position with a new name).

36. Thereafter, Plaintiff was told that she would be training several people regarding her job duties and continued to do so until the date she was laid off on June 29, 2009.

37. Plaintiff was told that she was training others so that she would have "back-up" for her vacation, when, in reality, Plaintiff was training other employees to assume her job responsibilities.

38. Plaintiff was laid off 10 days short of 25 years employment with the County, and replaced with a significantly younger female.

39. When Plaintiff inquired with HR *why* her job was shifted around and given to a younger female, Plaintiff was told that "*the County and Cooley could fill positions any way they see fit because [Cooley] is an elected official.*"

Complaint ¶¶ 13–39, Apr. 15, 2011, No. 11-CV-6194, ECF No. 1. Following Judge Larimer's decision, the parties entered into a stipulation of dismissal on August 16, 2011. In relevant part, that document states: "Plaintiff agrees to, and hereby does, voluntarily dismiss her remaining claims of age discrimination against the Defendants in their entirety and *with prejudice*." Stipulation of Dismissal ¶ 4, No. 11-CV-6194, ECF No. 12 (emphasis added).

With regard to *res judicata*, the Second Circuit has held:

The fact that both suits involve[] essentially the same course of wrongful conduct is not decisive; nor is it dispositive that the two proceedings involve[] the same parties, similar or overlapping facts, and similar legal issues… If the second litigation involve[s] different transactions, and especially subsequent transactions, there generally is no claim preclusion.

*Interoceanica Corp. v. Turbana Corp.*, 107 F.3d 86, 91 (2d Cir. 1997).

As discussed in the time-bar issue analysis above, Plaintiff is not suing based on discrete discriminatory events that occurred previous to the stipulation of dismissal. Nor does the Court take Defendant to be implying that Plaintiff gave up her right to sue for discrimination in the future by signing the Stipulation. Therefore, even though this cause of action involves many of the same facts that were involved in previous litigation, the current alleged acts of discrimination that form the basis of Plaintiff's recovery are not barred by *res judicata* and will be considered as relevant, supporting background information as they have been plead in the Complaint.

### Plaintiff does not plausibly allege an actual adverse employment action or constructive discharge

Both the ADA and ADEA require that a plaintiff plausibly allege an adverse employment action in order to state a claim of discrimination. The only paragraphs in the Complaint that state what might be called an adverse employment action are:

67. When Plaintiff arrived [back from leave for surgery], her supervisor met with her and told her that there were several changes to her job duties, and informed her yet again that she would be closely "monitored."

68. Plaintiff was shocked and told her supervisor that she may have no choice but to retire if they could not find additional support for the department.

69. Plaintiff was then admonished that she needed to "promptly sign her retirement letter" so they could "find her replacement."

70. However, Plaintiff wanted to wait and speak with the Human Resource department before she made her final decision.

71. Plaintiff's supervisors gave Plaintiff no choice but to sign the retirement letter "immediately," compelling Plaintiff to retire from her long term job with the County.

Compl. ¶¶ 67-71, ECF No. 1. Plaintiff further clarified in her response to Defendant's motion to dismiss "that she suffered an adverse employment action when she was forced to retire." Pl.'s Resp. Mot. Dismiss at 16, ECF No. 10. No other allegations

falling within the 300-day EEOC period or subsequent to the stipulation of dismissal ending the prior litigation can be interpreted to describe an adverse employment action.

Being "forced to retire" falls under the doctrine of constructive discharge. *See Ternullo v. Reno*, 8 F. Supp. 2d 186, 190 (S.D.N.Y. 1998) ("Given that plaintiff resigned from her position, she must rely on a theory of constructive discharge.") "A constructive discharge occurs when the employer, rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (quoting *Young v. Southwestern Savings & Loan Assn.*, 509 F.2d 140, 144 (5th Cir. 1975)). And, "'the working conditions [must] have been so difficult or unpleasant that a reasonable person in the employee's shoes would have been compelled to resign.'" *Id.*

The allegations in the Complaint fail to support the conclusory statements that Plaintiff was forced to retire on the basis of either her age or disability. While paragraphs 67 and 68 indicate that Plaintiff was "shocked" with the changes made to her responsibilities, it is not alleged that these changes made her position intolerable, therefore coercing her into retiring against her will. Nor does the complaint allege any way in which these changes may relate to an attempt to discharge her on the basis of her age or potential disability. Instead, the allegations are reasonably read to state that Plaintiff was surprised that the department had made changes while she was on leave, expressed an opinion about departmental staffing, and then brought up retirement of her own accord assumedly because of her displeasure with the changes. Therefore, as far as potential constructive discharge goes, "the plaintiff[] [has] not nudged [her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570, 127 S. Ct. 1955, 1974 (2007).

Reading further, the additional information supplied as background in paragraphs 17-54 may be interpreted as alleging a basis for finding a continuing violation. Those paragraphs contain five references to instances where a former supervisor asked Plaintiff about her retirement plans and one instance where he denied her "flex-time" for a medical appointment. However, these events occurred two or three years earlier while she was working in a different department under a different supervisor. Compl. ¶¶ 26-39, ECF No. 1. Plaintiff alleges no connection between the earlier events and those in the instant case. As previously stated, it was Plaintiff who suggested that she might retire in this instance, and the conditions that she faced upon her return are not alleged to have been intolerable. Since there was no negative or coercive action on behalf of the Defendant in the instant case, the most recent events cannot be interpreted as the latest in a series of actions toward constructive discharge. Thus, Plaintiff was not constructively discharged, and without any other allegations of actual discharge or other adverse employment actions, Plaintiff's ADA and ADEA claims fail and must be dismissed.

In the absence of any adverse employment action, the Court determines that it is unnecessary to decide whether Plaintiff has sufficiently alleged a disability or perception of disability under the ADA. The Court does note that the complaint is sorely lacking on this element as well because it offers no allegations illustrating Plaintiff's substantial limitations required to qualify as disabled under the ADA, nor does the complaint offer

any basis for believing that Defendant regarded Plaintiff as disabled.[1]

### Plaintiff alleges no adverse employment action due to engaging in a protected activity

Plaintiff's allegations regarding her retaliation claim are just as inadequate as her discrimination claims, failing to state any adverse employment action taken in response to any engagement in a protected activity. Although not clear from the complaint, Plaintiff's response to Defendant's motion states that she engaged in a protected activity when she twice requested additional leave in order to continue recuperating from knee surgery. Pl.'s Resp. Mot. Dismiss at 17, ECF No. 10. Additionally, Plaintiff states that she suffered an adverse employment action in retaliation for these requests when she was forced to retire. *Id.* at 17-18. The relevant paragraphs of the Complaint are as follows:

60. On or about January 12, 2011, Plaintiff continued having severe leg and knee pain.

61. Plaintiff again saw several doctors, but this time was informed that she required surgery.

62. Thereafter, Plaintiff was out on disability leave for the full six (6) months.

63. On July 14, 2011, at the advice of her doctors, Plaintiff requested an additional thirty (30) day leave of absence after having complications from the surgery, but was denied.

64. However, Human Resources notified Plaintiff that she was approved for the thirty (30) days, but still needed approval from her supervisor, which she never received.

65. On July 28, 2011, Plaintiff sent a second request for a thirty (30) day leave of absence, but never received an answer.

66. On August 22, 2011, Plaintiff was required to return to work because again, she was scared that she would either going [sic] to be terminated or lose her

---
[1] Indeed, Plaintiff's counsel at oral argument on June 21, 2013, conceded that the complaint failed to state a plausible cause of action under the ADA, stating: "I would agree [under Rule 11] there would be no cause of action for the ADA."

health insurance.

Compl. ¶¶ 60-67, ECF No. 1.

As discussed in the analysis of Plaintiff's ADA and ADEA discrimination claims above, the Court does not find that the Plaintiff suffered any adverse employment action. She voluntarily retired from her position with the County, and any allegations that she was coerced into resigning are conclusory or insufficient. Moreover, counsel for Plaintiff admitted at oral argument that Plaintiff received an additional seventh month of leave she alleges she requested but was either denied or received no answer on in paragraphs 63-65.[2] So to the extent that refusing to approve of her taking leave could be inferred as an adverse employment action, there is no such allegation because Plaintiff received what she had asked for without any detrimental effect. Since the Plaintiff has not suffered an adverse employment action, her retaliation claim is also dismissed.

---

[2] The Court notes that the allegations in paragraphs 62-66 could also be interpreted to mean that Plaintiff took six months leave as allowed under New York State law (N.Y. CLS Work Comp § 205), a seventh month as allowed under her CSEA union agreement (which was included as Exhibit 6 to Defendant's motion papers), and that she was seeking an eighth month of leave to finish recuperating. Since she was not granted an eighth month, this might have qualified as a request for reasonable accommodation assuming she was or was perceived to be disabled. However, when questioned directly at oral argument about this apparent ambiguity in the Complaint, Plaintiff's attorney explicitly stated that Ms. Caskey was seeking and received only seven months of total leave when she made the requests. Therefore, to the extent that she could have been seeking an eighth month and such request was denied or ignored by the Defendant, the Court takes the word of Ms. Caskey's attorney that such was not the case and infers that she was either unaware of the seventh month she was entitled to as a union member or was simply trying to inform her employer of her intent to avail herself of that benefit.

To the extent that the CSEA agreement was not part of the original complaint and should not be considered for the purpose of ruling on this motion, the Court is aware of its limitations as laid out in *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000). However, the applicable portion of the agreement was included with the Defendant's motion and brought to the attention of the Court an alternative interpretation of paragraphs 62-66 of the Complaint of which it would not otherwise have been aware. Subsequently, the Court questioned Ms. Caskey's attorney at oral argument about this interpretation which counsel explicitly rejected as discussed above. So, to the extent that the Court may have peeked behind the iron curtain of the complaint, doing so could have only helped Plaintiff survive this motion.

## CONCLUSION

In conclusion, Plaintiff has failed to adequately allege any adverse employment action subsequent to the stipulation of dismissal signed as part of her 2011 litigation against Defendant. Any claim of constructive discharge is undermined by the inadequacy of the paragraphs apparently attempting to allege that the conditions of her employment upon her return from leave were intolerable. Furthermore, any attempt to support the theory of constructive discharge by alluding to a continuing violation by the County through the "background" information provided in the complaint is misguided in light of the fact that it was Plaintiff herself who suggested she might retire in the instant case. Finally, counsel for Plaintiff explicitly disclaimed that Plaintiff was denied her request for additional leave and instead acknowledged she had taken the additional time requested without confirmation of approval. Since all of Plaintiff's claims require that she be harmed in some way and no harm has been plausibly alleged, all of Plaintiff's claims are hereby dismissed.

IT IS SO ORDERED.

Dated: July 15, 2013
       Rochester, New York

ENTER: /s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge